**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DAMASO JOHNSTON,

       Plaintiff,

    v.

HAMILTON COUNTY JUSTICE CENTER, et al.,

       Defendants.

Case No. 1:18-cv-864

Cole, J.
Bowman, M.J.

**REPORT AND RECOMMENDATION**

Plaintiff, an incarcerated individual who proceeds *pro se*, tendered a complaint against multiple Defendants on December 6, 2018, presenting allegations regarding an incident that occurred when Plaintiff was a pretrial detainee at the Hamilton County Justice Center ("HCJC") on September 7, 2018.[1] Upon initial screening, the undersigned recommended the dismissal of all claims except for Plaintiff's claim that Defendant Deputy Evers used excessive force against Plaintiff while breaking up a fight between Plaintiff and another inmate. (Doc. 12). Plaintiff subsequently filed a motion to amend his complaint. The undersigned granted the motion to amend, but continued to recommend that all claims be dismissed on initial screening except for the excessive force claim against Deputy Evers. (Doc. 21). That Report and Recommendation was adopted as the opinion of the Court on August 30, 2019. (Doc. 30).

Following a period of discovery on the sole remaining claim, Defendant Evers filed a motion for summary judgment. Although only one response to a motion is procedurally

---

[1]Plaintiff currently is incarcerated at the Pickaway Correctional Institution.

permitted, Plaintiff filed two responses in opposition to the motion, which Defendant addressed in his reply.[2]  Pursuant to local practice, this case has been referred to the undersigned for initial consideration and for a report and recommendation on any dispositive motions.  The undersigned now recommends that Defendant's pending motion for summary judgment  be GRANTED, and that this case be dismissed.

## I.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986).  The moving party has the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).  Once the moving party has met its burden of production, the nonmoving party cannot rest on the pleadings, but must present significant probative evidence in support of his case to defeat the motion for summary judgment. *Anderson*, 477 U.S. at 248-49. The mere  scintilla  of  evidence  to  support  the  nonmoving  party's  position  will  be

---

[2]Defendant waived any objection to the second response.  However, on September 8, 2019, Plaintiff filed a third "supplemental memorandum," which the undersigned construes as an unauthorized sur-reply. (Doc. 62).  This unauthorized memorandum is not only procedurally improper, but adds nothing new.  Therefore, it is not further considered.

insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party. *Id.* at 252.

As a pro se litigant, Plaintiff's filings are liberally construed. *Spotts v. United States*, 429 F.3d 248, 250 (6th Cir. 2005). However, his status as a pro se litigant does not alter his burden of supporting his factual assertions with admissible evidence when faced with a summary judgment motion. *Maston v. Montgomery Cnty. Jail Med. Staff Personnel*, 832 F. Supp. 2d 846, 851-52 (S.D. Ohio 2011) (citing *Viergutz v. Lucent Techs., Inc.*, 375 Fed. Appx. 482, 485 (6th Cir. 2010)). Here, Defendant has submitted evidence to support his motion, to which Plaintiff responds only with unsupported argument, as opposed to admissible evidence or citation to evidence of record that could create an issue of fact for trial.

## II.    Background

### A.  Evidence Submitted on Summary Judgment

As stated, on initial screening under the Prison Litigation Reform Act, the Court determined that Plaintiff's claim that Defendant Evers used excessive force was deserving of further development.[3] (Doc. 12). In support of his motion for summary judgment, Defendant has submitted an Affidavit setting forth his version of events. (Doc. 51). Defendant also has submitted a number of official records compiled in the ordinary course of business, including: 1) photographs of Plaintiff from the date of the incident; (2) a Use of Force Report; (3) Medical Use of Force Report; (4) Defendant Evers' Disciplinary Incident Report; (5) Deputy Joshua Flinchum's Disciplinary Incident Report; (6) Deputy

---

[3]The Court dismissed all claims against Defendant Evers in his official capacity, leaving only claims against Evers in his individual capacity. (Doc. 12 at 6).

Eric Greer's Disciplinary Incident Report; (7) Sgt. Melissa Kilday's Disciplinary Incident Report; (8) Plaintiff's Grievance Report of 06/28/2018; and (9) Plaintiff's Grievance Response Form dated 7/2/2018. (Doc. 50). Defendant separately has filed the following additional exhibits: (1) Sheriff's Office Investigator's Report of the incident; (2) Sheriff's Office Review Board Report; and (3) Sheriff's Office Inmate Appeal Report. (Doc. 52). Plaintiff has failed to rebut Defendant's affidavit testimony or any other exhibit through the submission of any contrary evidence of record. Therefore, to the extent that Defendant's motion is supported by unrebutted record evidence, Defendant's version of facts is accepted. However, to the extent that any issues of fact remain in the record, notwithstanding Plaintiff's failure to submit any evidence, all reasonable inferences have been construed in favor of Plaintiff.

### B. Findings of Fact

On September 7, 2018, Defendant Evers was leading Plaintiff and other inmates to a "holding tank." (Doc. 11; Doc. 51). Plaintiff alleges that he was walking directly behind Evers when Inmate Louis Carter came up behind Plaintiff, exchanged words, and began punching Plaintiff on the left side of his jaw. (Doc. 11 at 5; Doc. 51 at ¶3). Plaintiff responded by punching back. Defendant immediately called for backup to separate the inmates, and used force "to attempt to stop Johnston from fighting." (Doc. 51 at ¶6).

Plaintiff alleges that as he was trying to defend himself against Carter, Evers kneed Plaintiff and repeatedly struck Plaintiff in the chin or jaw. (Doc. 11 at 5-6). Plaintiff's complaint alleges that he stood up after Carter let him go and asked Evers why he had struck Plaintiff so many times, and Evers responded that it was because he had told Plaintiff and Carter to stop their fight. (*Id.*) Although Plaintiff's complaint alleges that

4

Defendant "never said stop," (*id.* at 6), Defendant's unrebutted affidavit attests that Defendant used force only after "Inmate Johnston refused commands to stop and break it up and kept fighting with inmate Carter." (Doc. 51 at ¶4).[4]

Defendant's affidavit further states that in the course of the fight with Carter, Plaintiff "began wildly throwing punches, one of which hit me." (*Id.* at ¶6). An incident report completed by Defendant soon after the incident similarly states that Plaintiff refused commands to stop and break up their fight, and that Plaintiff "was actively resisting and kept throwing wild punches to where one of them hit myself so I delivered 2 closed fist strikes to his facial region to stun Johnson, which worked." (Doc. 50-4 at 1). Defendant used force in order to successfully "stun" Plaintiff which resulted in Plaintiff "letting go of Carter," thereby allowing the deputies to separate the two inmates and handcuff Plaintiff. (*Id.* at ¶7). Plaintiff then began making verbal threats toward Defendant and took a step towards him, causing Defendant to push him back "to create space." (*Id.* at ¶8). Plaintiff was placed in a chair by non-party Deputy Greer, but "continued to make threats" towards Defendant and attempted to get out of the chair to physically engage with Defendant. (*Id.* at ¶9).

The Use of Force investigation described the incident as follows: "Inmates fighting refuse verbal commands to stop. Deputy used two knee strikes with no result, then two close hand strikes to the left side of [Plaintiff's] face as a stun technique for control which worked." (Doc. 50-2 at 1). The investigation concluded that Defendant used "minimal force to protect himself and another," and that the force used was in compliance with

---

[4]Defendant also has filed incident reports and Use of Force documents that corroborate his testimony.

departmental general orders and policy. (*Id.*) Defendant sustained small abrasions to his hand from striking Plaintiff, but required no medical treatment. (*Id.* at 2).

Plaintiff was provided with a medical examination and a band aid was applied to a small abrasion on his nose. When he returned to his cell, Plaintiff alleges that he noticed the right side of his chin was swollen, as was the left side of his temple. (Doc. 11 at 8). However, pictures and contemporaneous Use of Force records, along with contemporaneous medical records, do not reflect any visible injuries other than to Plaintiff's nose. (Doc. 50-1 at 3-4; Doc. 50-2). In fact, the report of the paramedic who examined Plaintiff states that Plaintiff "denies any LOC, states not injurie[d]," despite the visible small abrasion on the bridge of his nose. (Doc. 50-3). The report affirmatively states "[n]o other vis[i]ble injuries seen or complained of." (*Id.*)

Following the incident, Plaintiff was charged with six related violations, including: (1) assault on a staff member; (2) assault on a fellow inmate; (3) attempt to influence, intimidate or hinder an officer or staff member in the performance of their duties; (4) conduct that disrupts the security or order of the facility; (5) cause another to believe that the offender will cause physical harm to the person or property of another; and (6) fighting. (Docs. 50-5, 50-6, 50-7). A report by an investigator, Sgt. Kilday, states that Plaintiff maintained that Carter threw the first punch, and "does not recall the Deputies giving any verbal commands." (Doc. 50-7). A Review Board Report reflects that Plaintiff was initially convicted and confined to 20 days of disciplinary segregation. (Doc. 52-2). That report also states that Plaintiff "admits to fighting and not listening to Officer ordering him to break it up and striking Officer swinging wildly." (*Id.*) However, Plaintiff successfully appealed, as the Appeals Board determined: "During your hearing you were found guilty

6

and given 20 days; however at the hearing there was no notation of which charges you were found guilty of, therefore you are being released from lock in immediately." (Doc. 52-3).

Discovery closed on April 17, 2020. (Doc. 35). However, by Order filed on June 22, 2020, the Court granted Plaintiff's construed motion to compel and partially reopened discovery by directing the Defendant to respond to a written discovery request included in Plaintiff's construed motion. (Doc. 49 at ¶1). In the same order, the Court extended the dispositive motion deadline. (*Id.* at ¶2). On July 24, 2020, Defendant timely moved for summary judgment in this case on grounds that Plaintiff failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act, and alternatively, based on qualified immunity.

## III.     Analysis of Defendant's Motion

### A.   Exhaustion of Administrative Remedies

Defendant first seeks judgment on grounds that Plaintiff failed to exhaust his administrative remedies. Pursuant to the PLRA, prisoners are required to fully exhaust available institutional remedies prior to filing suit in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983 (2002).

It is well established that exhaustion is "mandatory under the PLRA and unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 201, 211, 127 S. Ct. 910 (2007). The PLRA requires "proper exhaustion of administrative remedies," meaning all applicable procedures and deadlines must be followed. *Woodford v. Ngo*, 548 U.S. 81, 84, 90-91 (2002). The exhaustion requirement's goals can be achieved "only if the prison grievance system is given a fair opportunity to consider the grievance." *Id.* at 82. "That cannot happen unless the grievant complies with the system's critical procedural rules." *Id.* If a prisoner fails to exhaust available administrative remedies before filing a complaint in federal court, or only partially exhausts them, then dismissal of the complaint is appropriate. *Hopkins v. Ohio Dep't of Corr.*, 84 Fed. Appx. 526, 527 (6th Cir. 2003) (citing 42 U.S.C. § 1997e(a) and *White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997)). "Exhaustion may not be completed after a federal complaint has been filed." *Hopkins*, 84 Fed. Appx. at 527 (citing *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999)). "In a claim by a prisoner, failure to exhaust administrative remedies under the PLRA is an affirmative defense that must be established by the defendants." *Napier v. Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011) (citing *Jones*, 549 U.S. at 204).

The Ohio Department of Rehabilitation and Correction ("ODRC") offers a three-step grievance system to every inmate at each of its institutions, including the Hamilton County Justice Center. *See* Ohio Admin. Code §5120-9-31(J). All inmates and staff members receive a written explanation of the grievance system and instructions for its use. Ohio Admin. Code § 5120-9-31(C). The first step of the grievance procedure allows inmates to submit an informal complaint to the supervisor of the department or staff member directly responsible for the issue concerning the inmate, but requires any such

8

complaint or grievance to be submitted no later than fourteen days from the date of the event giving rise to the grievance. Ohio Admin. Code § 5120-9-31(J)(1). If an inmate is dissatisfied at step one, he may proceed to step two by filing a notification of grievance with the Inspector of Institutional Services. *Id.*; *see also* Ohio Admin. Code § 5120-9-31(J)(2). Finally, if dissatisfied with the results at step two, the inmate may file an appeal with the Office of Chief Inspector at ODRC. Ohio Admin. Code § 5120-9-31(J)(3). Only if the inmate remains dissatisfied following receipt of the decision from the Chief Inspector may an inmate file a civil lawsuit in federal court.

"When the defendants in prisoner civil rights litigation move for summary judgment on administrative exhaustion grounds, they must prove that no reasonable jury could find that the plaintiff exhausted his administrative remedies." *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017) (citing *Surles v. Andison*, 678 F.3d 452, 455-456 (6th Cir. 2012)); *see also Fraley v. Ohio Dep't of Corr.*, No. 16-4720, 2018 WL 2979902, at *2 (6th Cir. Mar. 22, 2018) (defendant must prove non-exhaustion by preponderance of the evidence); *Quinn v. Eshem*, 2016 WL 9709498, at *2 (6th Cir. Dec. 20, 2016) (citing *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (burden of proof falls on defendants)). Here, Defendant has failed to meet this burden of proof on the record presented. *Accord Ashdown v. Buchanan*, 2019 WL 3718315 (S.D. Ohio Aug. 7, 2019) (holding that genuine issues of material fact existed as to whether grievance process was "available," precluding summary judgment).

Defendant asserts that Plaintiff failed to file <u>any</u> timely grievances concerning the excessive use of force by Defendant Evers. Defendant argues that "HCJC records show that Plaintiff's only grievance …came on June 26, 2018 about the unfair distribution of

9

uniforms." (Doc. 54 at 7). However, despite including a copy of the unrelated June 26 grievance, Defendant has failed to support his argument that no other grievances exist with a declaration or affidavit from any institutional custodian.

In contrast to Defendant's argument, Plaintiff alleges in his complaint that he "wrote Grievance about my chin fracture from the[ir] staff and I need some medical attention, no answers back." (Doc. 11 at 3).[5] Relevant to the issue of grievances, the complaint also alleges:

> I been writing grievance since I was assaulted by a staff member and inmate that was caught on tape September 7, 2018. They all working together, because none of my grievances about staff member M. Evers hasn't been answered back and I put in alot [sic] of grievances to be taken over to UC hospital for x-ray's on my chin and see how bad this staff had fracture[d] my chin with four closed fist than his knee!

(Doc. 11-1 at 1, 6). In opposition to Defendant's motion, he similarly maintains that he wrote multiple grievances but received no responses:

> I'd wrote 'Grievance Complaints' to the Sergeant, Lieutenant, and Captain from September 2018 until November 2018, leaving a two month window for a respond back….and nobody came to address the matter or gave any copies of the "Grievance Complaints" to let me know if something was going to be done. I even filed a Grievance saying that I wanted to press assault charges against the Defendant Deputy Mark Evers, an[d] nobody respond. I wrote a Grievance on Medical about my x-ray, as the Supervisor Nurse on first shift did come to respond and she did not give me no cop[y] of that Grievance, but she said the Doctor told her, I had no fra[c]ture.

(Doc. 56 at 1). Plaintiff insists he complied with the requisite Grievance procedure by writing "three complaints" prior to filing a civil suit, including his complaint to the Defendant's supervisor (the Sergeant), followed by a complaint to the Sergeant's

---

[5]In screening Plaintiff's claims, the Court determined that Plaintiff had failed to state a claim for the denial of medical care because he had not identified anyone who allegedly had denied him requested treatment. (Doc. 12 at 4, n.2).

supervisor (the Lieutenant) and last by a complaint to the Captain, in addition to separate complaints to the Internal Affairs Office and the Supreme Court of Ohio. (*Id.* at 2-3; *see also* Doc. 60 at 2).  Plaintiff's argument is reasonably construed as an assertion that he exhausted all administrative remedies that were "available" to him, and that any failure to exhaust is attributable to the institution.

> Under the PLRA, inmates must exhaust only "available" administrative remedies.
>
> In *Ross,* the Supreme Court …clarified that "available" meant that the administrative remedy was one that was "capable of use" to obtain "some relief for the action complained of." 136 S.Ct. at 1859 (quoting *Booth,* 532 U.S. at 738, 121 S.Ct. 1819) (internal quotations omitted).  In noting that the reality of the prison grievance systems may render some of the available administrative remedies unavailable, the Supreme Court laid out three circumstances providing an exception to the PLRA's exhaustion requirement. *Id.* at 1859. These three circumstances are: 1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; 2) when "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use[—i.e.,] some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"; and 3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

*Blissit v. Fiquris*, 345 F.Supp.3d 931, 939-40 (S.D. Ohio, 2018).

The parties' contrasting arguments present a factual issue concerning the third exception to the PLRA's exhaustion requirement: the possibility that jail administrators deliberately ignored or discarded Plaintiff's grievances.  Unfortunately, neither Plaintiff nor Defendant point to any *evidence* by which the undersigned can resolve this issue on summary judgment.  Just as Defendant has failed to supply any declaration or affidavit from an institutional records custodian, Plaintiff likewise has failed to submit a sworn declaration or other evidence that would support his contention that he submitted

numerous grievances. *Contrast Troche v. Crabtree*, 814 F.3d 795 (6th Cir. 2016) (explaining that despite records custodian attesting that plaintiff had not submitted any grievances, inmate's sworn declaration that he submitted grievances on specific dates to specific individuals was sufficient to create a genuine issue of material fact that precluded summary judgment).

It is true that Plaintiff's argument that the institution failed to respond to his step one grievances *might not* excuse his failure to follow through with an appeal at step two or step three. Ohio's grievance process states that if no response to a step one grievance is received by an inmate within eleven days, "the informal complaint step is automatically waived and the inmate may proceed to step two." Ohio Admin. Code 5120-9-31(J)(1).[6] However, step two must be completed "no later than fourteen calendar days from the date of…waiver of the informal complaint step." O.A.C. 5120-9-31(J)(2). If an inmate does not receive a decision on step two "after a total of twenty eight days from the receipt of the grievance,…the inmate may proceed to step three of the process." *Id.*

The issue of exhaustion is relatively close because Plaintiff does not argue that he timely complied with either step two or step three after the requisite time period expired without a response to his step one grievances. However, exhaustion is an affirmative defense. Defendant does not argue that Plaintiff failed to timely complete steps two or three, but instead limits his argument to the assertion that Plaintiff never complied with step one. Based upon the Defendant's failure to submit probative evidence, a genuine issue of material fact remains in dispute on that issue. Because the Defendant has failed

---

[6]Defendant has not filed a copy of HCJC's grievance procedure but asserts it is identical to Ohio's current grievance process.

to carry his burden of proof, Defendant is not entitled to summary judgment on this ground. *Accord Anderson v. Lawless*, 2020 WL 1130328 (S.D. Ohio March 6, 2020) (denying summary judgment on failure-to-exhaust issues, holding that Defendants failed to carry their burden of proof on the issue).

### B. Defendant Evers is Entitled to Qualified Immunity

Despite Defendant's failure to carry his burden of proof on the affirmative defense of exhaustion, Defendant is entitled to summary judgment based upon his assertion of qualified immunity. On this issue, Defendant has submitted evidence that shows only minimal force was used to break up a fist fight between two combatant inmates after Plaintiff ignored a verbal command to stop fighting.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S.Ct. 808, 815, 555 U.S. 223, 231 (U.S. 2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)). Qualified immunity "'gives ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 343, 341 (1986)); *see also Dorsey v. Barber,* 517 F.3d 389, 394 (6th Cir. 2008). Qualified immunity applies regardless of whether the official's error was a mistake of law or a mistake of fact, or a mistake based on mixed questions of law and fact. *Pearson,* 555 U.S. at 231.

It is well established that the excessive use of force by a prison official constitutes the "unnecessary and wanton infliction of pain" in violation of the Eighth Amendment's

prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285 (1976). Through the Due Process Clause of the Fourteenth Amendment, pretrial detainees are entitled to the same Eighth Amendment rights as are other inmates. *Thompson v. Cty. of Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994). "Thus, Supreme Court precedents governing prisoners' Eighth Amendment rights also govern the Fourteenth Amendment rights of pretrial detainees." *Ruiz-Bueno v. Scott*, 639 Fed. Appx. 354, 358 (6th Cir. 2016).

In order to make out a claim of excessive force that violates the Eighth Amendment, an inmate must allege conduct that would satisfy both an objective and a subjective component. In *Williams v. Curtin*, 631 F.3d 380 (6th Cir. 2011), the Sixth Circuit summarized these two elements:

> Although prison discipline may require that inmates endure relatively greater physical contact, the Eighth Amendment is nonetheless violated if the "offending conduct reflects an unnecessary and wanton infliction of pain." *Pelfrey v. Chambers,* 43 F.3d 1034, 1037 (6th Cir. 1995) (internal alterations and quotation marks omitted). To make out a claim under the Eighth Amendment, the prisoner must satisfy both an objective and a subjective component. *See, e.g., Moore v. Holbrook,* 2 F.3d 697, 700 (6th Cir. 1993).

> The subjective component focuses on the state of mind of the prison officials. The relevant inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6, 112 S. Ct. 995 (1992) (internal quotation marks omitted). Courts may consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078. Courts may also consider the circumstances "as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.*

> The objective component requires the pain inflicted to be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321 (1991). This

14

>    is a "contextual" inquiry that is "responsive to contemporary standards of
>    decency." *Hudson*, 503 U.S. at 8-9, 112 S. Ct. 995 (internal citation and
>    quotation marks omitted). The seriousness of the injuries are not
>    dispositive; as the Supreme Court has held, "[w]hen prison officials
>    maliciously and sadistically use force to cause harm, contemporary
>    standards of decency always are violated ... whether or not significant injury
>    is evident." *Id.* at 9, 112 S. Ct. 995*; see also Wilkins v. Gaddy*, 559 U.S. 34,
>    130 S. Ct. 1175, 1178, 175 L.Ed.2d 995 (2010) (per curiam).

*Id.*, 631 F.3d at 383.

Evaluating whether a prison official used excessive force in breaking up a fight between two inmates or in quelling some other violent disturbance can be difficult, particularly where an inmate has sustained a significant injury from that use of force.  On the other hand, when the record strongly supports the need for some physical force, and reflects that no more than a de minimis injury was actually inflicted from the necessary use of force, courts are less likely to second-guess the amount of force employed.  "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 559 U.S. at 38 (additional internal quotation marks and citation omitted).   In fact, the Supreme Court has cautioned against second-guessing correctional officers when, in acting to quell a physical disturbance, they are required to make split-second decisions in a fast-paced and pressure-filled environment.  *Hudson,* 503 U.S. at 6; *Whitley,* 475 U.S. at 320-22.

Here, the record reflects that Defendant resorted to the force of his fists only after Plaintiff ignored verbal commands to stop fighting, and also ignored Defendant's initial use of lesser physical force (his knee) to separate and subdue the combatants.[7]  During

---

[7]Even if the Defendant had not first issued an unheeded verbal command, Defendant's use of physical force to stop two brawling inmates not be unreasonable unless the facts demonstrated that the force employed was unnecessary and used to justify the wanton infliction of pain.

the brief melee, Plaintiff was "swinging wildly" at Carter, and connected with Defendant.[8] Because Plaintiff does not point to any evidence of record that contradicts the evidence submitted by Defendant, there is no genuine issue of material fact remaining for trial.[9] At the summary judgment stage, if the relevant facts are undisputed, the objective reasonableness of an officer's use of force "is a pure question of law." *Dunn v. Matatal*, 549 F.3d 348, 350 (6th Cir. 2008) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8).

Although Plaintiff denies that he struck Defendant, Defendant has submitted an unrebutted affidavit that avers that one of Plaintiff's punches landed on him. On the record presented, Defendant's use of his knee and fists to break up the fight and protect himself and others was objectively both necessary and reasonable. Still, Plaintiff protests that Defendant landed too many punches, and acted "out of ang[er] and not self defense." (Doc. 60 at 3). Plaintiff asserts that Defendant punched him five times, not just twice as reported. Defendant's affidavit does not specifically detail the number of punches he threw, but contemporaneous incident reports in support of summary judgment put the number at two. Plaintiff has submitted no contrary evidence.

The lack of any injury provides additional context and supports the grant of summary judgment. The complaint alleges that the Defendant's blows caused an

---

[8]Plaintiff denies that occurred, but the unrebutted evidence is that it did. The fact that Defendant was not injured by the contact does not negate the issue of reasonably perceived danger that Plaintiff's actions posed to the deputies as well as to the other inmate.

[9]Video evidence can often settle fact disputes created by conflicting witness accounts on summary judgment. *See Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769 (2007). Here, neither party has submitted any video evidence. Plaintiff complains about the absence of video evidence, but the record suggests that Plaintiff failed to comply with discovery rules within the allotted period that would have allowed him to obtain that video. And, although Plaintiff alleges that video evidence should have existed, he also alleges in his amended complaint that Captain Kerr reported that the video showed that Inmate Carter struck first, but did not show the use of force by Defendant that Plaintiff had alleged. (Doc. 20 at 1-2). Here, summary judgment is appropriate despite the absence of video because Plaintiff has failed to submit <u>any</u> evidence that contradicts Defendant's well-supported account.

objectively serious injury - a fracture of Plaintiff's chin.  However, Plaintiff has offered no evidence to substantiate any injury at all.  By contrast, Defendant has submitted a contemporaneous medical record that reflects that Plaintiff suffered no more than a de minimis injury to his nose (from the other inmate), for which a band-aid was applied.  No follow-up care was required.  The pictures filed by Defendant as well as the medical record confirm that Plaintiff affirmatively denied any other injury at the time and that no other injury was observed.

Although Plaintiff alleges in his complaint that HCJC personnel refused to take him to the hospital for x-rays of his chin, there is no evidence to substantiate that he submitted any medical requests to HCJC for treatment for his alleged chin injury, or that he made any formal complaints to HCJC regarding his medical care.[10]  Plaintiff also has failed to submit any medical or other records that would corroborate his alleged later discovery of his injury.  Even if Plaintiff believed that HCJC would not provide adequate treatment, the record reflects that Plaintiff has been incarcerated at the Pickering Correctional Facility since September 2019, where presumably he could have sought additional medical attention that could have substantiated his allegation of a previously broken and/or improperly healed jaw bone.[11] On summary judgment, Plaintiff may not rely on unsupported allegations in the face of Defendant's contrary evidence that Plaintiff had no

_____

[10]Plaintiff's requests to this Court after he initiated suit are not evidence that he made timely requests to HCJC.  (*See e.g.*, Doc. 4 (motion filed 1/4/19 seeking to "get x-rays done to see how bad my injury is."); Doc. 9 (letter complaining that HCJC had not taken him to UC for imaging as requested); Doc. 16 (document captioned "Appeal Evidence" in which Plaintiff states that "there may also be a fracture of my chin" and seeks "a proper x-ray by a bone specialist.")).

[11]Ordinarily, the Ohio Department of Rehabilitation and Correction conducts a medical assessment when a new inmate is transferred into a facility. However, neither party has offered any medical evidence from Plaintiff's current place of incarceration.

discernible injury. A reasonable officer would not have believed that the use of force to break up a fist fight between Plaintiff and Inmate Carter, where the amount of force resulted in no injury, violated the Eighth Amendment. Considering the uncontested record submitted by Defendant and the lack of any evidence to support Plaintiff's account, Defendant appears entitled to qualified immunity and to judgment as a matter of law.

The only allegation that gives the undersigned some pause is Plaintiff's allegation that Defendant "choke[d]" him after Plaintiff was handcuffed and placed in a chair by another deputy. (Doc. 11 at 7). Plaintiff's complaint alleges that he continued to ask Defendant "why you knee me in my chin like that" when Defendant "started getting loud with me!" (*Id.*) He further alleges:

> While I am hand cuff behind my back and sitting in the chair when [Defendant] walk down on me all aggressive saying mutha fucker I told you to stop and I told him that you never said nothing and why did you hit me in my face does many times! I told him you seen that guy had a grip of my face and that aint give you a reason for all them punches to my face, as he got smart with me and I told him you hit me all them time trying to knock me out and that don't make you a man for striking me like that. So he got mad and choked me out the chair when we both looked up at the camera and he let me go….

(Doc. 11-1 at 3-4). Plaintiff's complaint does not allege any difficulty breathing or any bruising or any other type of injury from the allegedly brief "choking."

Defendant's affidavit does not *explicitly* address this allegation, nor do the other documents submitted on summary judgment. Applying a chokehold to a fully subdued, restrained and compliant inmate, in an effort to inflict pain rather than to restore order, undoubtedly would run afoul of the Eighth Amendment. However, notwithstanding Defendant's failure to *explicitly* deny the allegation, his affidavit contains an *implicit* denial that he touched Plaintiff after he was placed in the chair. In addition, Defendant

18

contradicts any suggestion that Plaintiff was fully subdued and compliant. Chronologically detailing the events, Defendant's affidavit states:

> Deputy Greer …placed [Plaintiff] in a chair, where he continued to make threats towards me and attempt[ed] to get out of the chair to come at me.
>
> At that point I walked down towards the cages to wait for the supervisors.

(Doc. 51 at 2, ¶¶8-9). Defendant's sworn statement that Plaintiff continued to make threats and attempted to physically "come at" Defendant is unrebutted. If the Court accepts the implicit denial that in reaction to Plaintiff's physical attempt to "come at" Defendant, that "[a]t that point" Defendant walked away, then the undersigned would conclude that Defendant is entitled to qualified immunity because the choking did not occur.

However, even if a reviewing court were to determine that Defendant's implicit denial is not sufficient to resolve the issue of whether (as Plaintiff alleges) he reactively "choked" Plaintiff before leaving the area, it is undisputed that Plaintiff was not subdued but remained combative despite being handcuffed. In addition, Plaintiff's own allegations reflect an exceptionally brief incident in which Defendant "let…go" immediately after seeing himself on video camera. Also, the lone injury alleged by Plaintiff was to his chin from Defendant's punches; Plaintiff does not allege that the "choking" was so severe that Plaintiff could not breathe, or that the incident left any mark or bruising or caused any injury at all.[12]

---

[12]The undersigned, like virtually all citizens of the United States at this time in history, is acutely aware of incidents in which various members of law enforcement in our country have been accused of choking black men quite literally to death. The Court's legal analysis is in no way intended to condone the unnecessary use of violence against inmates, or the use of a chokehold even if the use of force is not unconstitutional on the record presented. Here, the undersigned emphasizes that the analysis is limited to discerning whether Defendant is entitled to qualified immunity on the constitutional claim asserted.

The second part of an Eighth Amendment claim – the objective component-requires that the "pain inflicted to be 'sufficiently serious' " to offend "contemporary standards of decency." *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014) (quoting *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), and *Hudson*, 503 U.S. at 8).  As the Supreme Court has explained, not every "malevolent touch" by a prison guard gives rise to a federal cause of action. *Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1031 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")).  Based upon the uncontested facts that Plaintiff was verbally threatening Defendant and remained physically combative, and even crediting Plaintiff's account that Defendant reacted by briefly choking him before letting go without causing any discernable injury, Defendant would remain entitled to qualified immunity because the alleged "malevolent touch" does not rise to the level of an Eighth Amendment injury.

## IV.    Conclusion and Recommendations

For the reasons stated, **IT IS RECOMMENDED THAT** Defendant's motion for summary judgment (Doc. 54) be **GRANTED** and that this case be **CLOSED**.


*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DAMASO JOHNSTON,

      Plaintiff,

        v.

HAMILTON COUNTY JUSTICE CENTER, et al.,

      Defendants.

      Case No. 1:18-cv-864

      Cole, J.
      Bowman, M.J.


**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).