**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DAMASO L. JOHNSTON,                                    Case No. 1:18-cv-864

     Plaintiff,                                                        Cole, J.
                                                                      Bowman, M.J.

          v.

HAMILTON COUNTY JUSTICE CENTER, et al.,

     Defendants.

**SUPPLEMENTAL REPORT AND RECOMMENDATION**

On December 6, 2018, Plaintiff initiated this civil rights action against the Hamilton County Justice Center and Deputy M. Evers.  Upon initial screening, the Court permitted only a single excessive force claim against Defendant Evers to proceed to discovery. (Docs. 12, 21, 35).  On October 16, 2020, the undersigned filed a Report and Recommendation ("R&R") that recommended that Defendant's motion for summary judgment on that claim be granted, and that this case be dismissed and closed. (*See* Doc. 64).  Two additional R&Rs recommended the denial of habeas relief.  (*See* Docs. 55, 65).

On February 11, 2021, the presiding district judge reviewed all three R&Rs.  The Court adopted the R&Rs that denied habeas relief.  However, the Court re-committed the case to the undersigned for further consideration of the pending R&R on summary judgment in light of a post-R&R filing by Plaintiff. (Doc. 70).  The undersigned has reviewed the additional records in accordance with the Court's instructions, and again recommends that Defendant's motion for summary judgment be **GRANTED**.

I.    **Background**

   A.  **Claims Presented in Complaint Filed under 42 U.S.C. § 1983**

In his Opinion and Order, U.S. District Judge Douglas R. Cole provided the following

summary, which is quoted at length for the Court's convenience:

> On September 7, 2018, Plaintiff Damaso Johnston, a pretrial detainee at HCJC, awaited trial on state criminal charges. That morning, Johnston and …other detainees were transported…. During this move to a secure holding facility in the courthouse, a violent fight erupted between Johnston and fellow detainee, Louis Carter. (Compl., Doc. 11, #75; Resps.' Am. Mot. for Summ. J., ("Mot. for Summ. J."), Doc. 54, #231).

> Mark Evers, the County Deputy charged with orchestrating the transfer, says that he immediately yelled at Johnston and Carter to stop. (Mot. for Summ. J. at #231). But the two ignored him. As Johnston and Carter continued to "brutally attack each other," one of Johnston's punches meant for Carter went astray and hit Evers. (Mark Evers Aff., Doc. 51, #211; Mot. for Summ. J. at #231). At that point, Evers decided to use force to stop the fight. (Mark Evers Aff., Doc. 51, #211; Compl., Doc. 11, #75). Evers managed to "stun" Johnston, using "two knee strikes with no result, then two closed hand strikes [or what could be described as "punches"] to the left side of [Johnston's] face." (Sheriff's Office Use of Force Rep., Doc. 50-2, #202). This, Evers submits, is a commonly used stun technique, which gave another deputy (who Johnston claims was Deputy Greer) enough time to restrain Johnston with handcuffs. (Mark Evers Aff., Doc. 51, #211).

> Evers says that, at that point, Johnston turned his sights on Evers, first launching verbal threats and then stepping towards him. (*Id.*). Evers says that he pushed Johnston back to "create space." (*Id.*). Deputy Greer then placed Johnston in a chair. (*Id.*). But that did not end the hostility. According to Evers, Johnston continued his barrage of verbal threats. (*Id.*). Johnston then attempted to leave the chair and "come at" Evers, who says he chose to walk away and "wait for the supervisors." (*Id.*).

> In the summary judgment proceedings before the Magistrate Judge, Johnston did not submit a competing account. He made various allegations in his Complaint and assertions in his motions, of course, but those are not "evidence." And beyond that, he submitted nothing.  Since the R&R issued, though, Johnston has provided a sworn affidavit, and the story it relates varies in some respects from Evers' telling. According to Johnston, Evers never commanded him to stop fighting with Carter. (Johnston Aff., Doc. 67-1, #313). Instead, Johnston says that Evers' first reaction to the fight was to knee Johnston in his ribs and punch him five times in the face. (*Id.* at #312-13). While Johnston agrees that he was cuffed and placed in a chair,

> Johnston says that he then began to scold Evers for hitting him. (*Id.*). The two began cursing at each other and then, Johnston testifies, Evers became so angry that he "put both of his hands around [Johnston's] neck" and began to "choke" Johnston, who was still handcuffed in the chair. (*Id.* at #314). After that, Johnston says, Evers "storm[ed] down the hallway." (*Id.*).

(Doc. 70 at 3-5, PageID 324-326).

In addition to the allegations concerning the altercation and alleged excessive use of force by Evers, Plaintiff alleged in his complaint that he was denied medical treatment for a fractured chin and that he was wrongly convicted of a disciplinary "ticket" based upon Evers' false testimony.  Last, Plaintiff alleged that he submitted grievances about the incident that went unanswered.  (*See generally*, Doc. 70 at 5-6, PageID 326-327, and Doc. 11, Complaint).  Upon initial screening, the Court dismissed all claims except for Plaintiff's excessive force claims against Evers in his individual capacity, which the Court determined should proceed under 42 U.S.C. § 1983.  (Docs. 12, 21, 30).  Therefore, the only § 1983 claim remaining is Plaintiff's excessive force claim.

## B.  Prior R&Rs Denying the Addition of Habeas Corpus Relief

During the months after Plaintiff filed this civil rights case, the state criminal charges that had been pending while he was housed as a pretrial detainee in the Hamilton County Justice Center were resolved, and Plaintiff was sentenced to a term of imprisonment in a state institution.  After the Court narrowed Plaintiff's § 1983 claims in the above-captioned case, Plaintiff began filing a series of motions and petitions seeking a downward adjustment of his recently-imposed state sentence as additional relief to be obtained within this case.   Plaintiff asserted that this Court should reduce his state sentence by the thirteen days he spent in lock-in during his pretrial detention as punishment for hitting Evers, on grounds that his punishment was undeserved. (Doc.

139).  The undersigned denied that motion, explaining that the issue must be presented in a separate petition for writ of habeas corpus and not within the context of this § 1983 case, in which Plaintiff's claims had been distilled to a single claim against Evers for monetary damages. (Doc. 43).  Plaintiff next filed two additional motions or petitions – still in the above-captioned case – that he characterized as "habeas" style petitions.  (Docs. 44, 63). The undersigned filed two R&Rs recommending the denial of both motions/petitions.  (Docs. 55, 65).

On February 11, 2021, Judge Cole adopted the R&Rs denying habeas relief without prejudice to Petitioner's ability to file a new habeas corpus petition if desired. Under the heading "**Johnston Is Not Entitled To Habeas Relief In This Action, No Matter How His Request Is Labeled**," the Court once again explained to Plaintiff that he should file a new case - a petition for writ of habeas corpus - complete with payment of the requisite filing fee or motion for leave to proceed *in forma pauperis.* (Doc. 70 at 14, PageID 335, emphasis original).  Judge Cole advised that the new case must identify as the sole respondent "the person who has custody" over the imprisoned petitioner, which ordinarily is the warden of the facility where the prisoner is being housed.  (*Id.*, citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004) (additional internal citations omitted)).  The Court also counseled Plaintiff that under the legal principles applicable to habeas corpus relief, "Johnston would likely need to first exhaust his remedies in state court" prior to filing a petition for writ of habeas corpus in federal court.  (*Id.* at 15, PageID 336); *see also, generally,* 28 U.S.C. § 2254(b).

## C.  Defendant's Summary Judgment  Motion on § 1983 Claims

In his initial motion for summary judgment, Defendant Evers sought judgment based upon two arguments: (1) that Plaintiff had failed to exhaust his administrative remedies; and (2) that Defendant was entitled to qualified immunity. (Doc. 54).   The undersigned recommended denial of Defendant's motion on the first argument, but recommended that judgment be granted on the second argument.   While Plaintiff had filed several memoranda in opposition to summary judgment, he did not challenge the evidentiary record supplied by Defendant or produce any evidence of his own.   Based on the then-uncontested record, the undersigned concluded that Defendant was entitled to qualified immunity because the force employed was objectively reasonable. (Doc. 64).

Objections must be filed within fourteen days of service of the R&R.   In this case, Plaintiff was required to file any Objections by October 30, 2020.   None were timely filed. Instead, on November 16, 2020,[1] Plaintiff filed a document entitled "Responding to Report and Recommendation" that was construed and docketed as an untimely Objection to the recommended denial of habeas relief.   On the same date, Plaintiff also filed a "motion to appeal to re-open excessive force claim" as well as an affidavit, (Doc. 67), that the presiding district judge construed as a *possible* second Objection to the R&R on summary judgment. (*See* Doc. 70 at 11-12, noting that the document "appears to be an objection" despite its caption as a motion).

Although Judge Cole agreed that Plaintiff had failed to offer any timely evidence to contest the factual record supplied by Defendant, Judge Cole re-committed the matter to the undersigned to review the tardy affidavit attached to the construed possible Objection.

---

[1] The postmark on the envelope reflects a mailing date of November 12, 2020, which still falls beyond the 14 days provided under Rule 72(b).

> In this objection (assuming that is what it is), Johnston addressed only Evers' administrative exhaustion argument…. But, while not mentioning the qualified immunity issue, Johnston also submitted an affidavit containing his version of the events relating to Evers, thus potentially undercutting the R&R's treatment of that issue, which had been predicated on the lack of record evidence on that topic

(Doc. 70 at 12). "[A]lthough he failed to substantiate [his § 1983 claim] before the Magistrate Judge, the Court concludes that, given his late-submitted evidence, the proper course is to re-commit this matter to the Magistrate Judge for her consideration of that evidence in the first instance." (Doc. 70 at 14; *see also id.* at 16-18 (explaining that Plaintiff's construed Objection would be considered in the interests of justice despite being both untimely and overly general, such that it was not entitled to de novo review)). "In particular, the Court instructs the Magistrate Judge: (1) to determine whether Johnston should be allowed to supplement the record with his newly tendered affidavit; and (2) if so, to determine whether, applying the Fourteenth Amendment excessive force standard described above, there is a genuine issue of material fact, based on this new evidence, as to Evers' qualified immunity defense." (*Id.* at 24).

As stated, in addition to asserting qualified immunity, Defendant had argued that Plaintiff had failed to exhaust his administrative remedies prior to filing suit. The October 16, 2020 R&R rejected that argument, reasoning that Defendant had failed to carry his burden of producing sufficient evidence to prove that affirmative defense. Judge Cole agreed. However, because the case was being re-committed on the affidavit/qualified immunity issue, Judge Cole instructed the undersigned to permit Defendant to supplement the record on the additional issue of exhaustion.

> [T]he Court also instructs the Magistrate Judge to allow Evers to supplement the record on the administrative exhaustion issue (and to allow

> Johnston to respond to any new evidence Evers provides). It may be that
> Evers can address the evidentiary shortcoming that the R&R identified….

(Doc. 70 at 27).

In order to comply with the Court's direction, the undersigned ordered additional briefing and further supplementation of the evidentiary record. Thus, Defendant Evers was directed to file a Supplemental Memorandum in Support of Summary Judgment that addressed the following issues: (a) whether to consider the November 9, 2020 affidavit that Plaintiff attached to his motion/construed Objection to the R&R recommending summary judgment; (b) if the affidavit is considered, whether its contents create an issue of fact sufficient to defeat summary judgment; and (c) any relevant issues relating to the previously asserted administrative exhaustion defense. Defendant also was ordered to "produce any additional evidence that may respond to the factual issues presented in Plaintiff's late-filed affidavit" or concerning the exhaustion issue. (Doc. 71 at 4, PageID 353). Last, on or before March 22, 2021, Plaintiff was ordered to "file a **single** Supplemental Reply Memorandum that addresses Defendant's Supplemental Memorandum and any evidentiary exhibits filed in accordance with paragraphs 1 and 2 of this Order.**"** (*Id.* at 5, emphasis original).

Plaintiff did not wait to file a "single" reply memorandum. Instead, on February 22, 2021, Plaintiff immediately filed a document docketed as an "appeal motion" in which he asks "to re-open up, my excessive force case." (Doc. 72 at 1, PageID 355). In this motion, Plaintiff posits that too many inmates are denied relief "due to the fact no grievance that us inmates are filing" are properly "documented." (*Id.*) Plaintiff complains that the jail's failure to document grievances amounts to a "loop-hole to cheat inmates out of our rights" and urges this Court to "watch the video" to decide this case on the merits. (*Id.*) Plaintiff's

"motion/appeal" is not an appeal from a final judgment of this Court.  If Plaintiff seeks further review of his excessive force claims against Evers, the motion should be denied as moot because Judge Cole has already recommitted this matter for further review.

On March 1, 2021, Plaintiff filed yet another motion entitled "writ of habeas corpus" allegedly directed to "Warden Emma Collins." (Doc. 73).  Warden Collins is not a party to this civil rights case.  The Court is at a loss to further explain to Plaintiff the reasons why habeas relief cannot be granted within this case.  Plaintiff was permitted to amend his complaint once early in this litigation, and the time for adding claims or defendants has long passed.  No further amendments will be permitted and no additional Defendants can be added at this late date - even if it were appropriate to address habeas corpus and §1983 relief in a hybrid action.[2]  For the reasons previously stated, habeas relief should be denied without prejudice to Petitioner's right to file a new petition for writ of habeas corpus.  To drill down on Judge Cole's prior instruction, any new case should not bear the above case caption, but should be filed as a new petition seeking habeas relief that is: (1) accompanied by payment of the requisite filing fee or an *in forma pauperis* application; (2) identifies the petitioner's custodian as the sole respondent; and (3) is filed only if petitioner has satisfied any applicable prerequisites of exhaustion.

Unlike Plaintiff, Defendant complied with the Court's February 19, 2021 Order.  On March 3, 2021, Defendant filed a "Notice" of the manual filing of additional evidence that responds to Plaintiff's post-R&R "affidavit" if that affidavit is to be considered by the Court.

---

[2] Nearly all federal courts strongly disfavor "hybrid" actions by state prisoners that attempt to seek both §1983 relief for monetary damages and time off a prisoner's incarceration under 28 U.S.C. § 2254.  *See, generally Lee v. Bonner*, 2020 WL 4551249, at *3 and n.3 (W.D. Tenn.  Aug. 6, 2020) ("A civil rights action and a habeas petition have distinct purposes and contain unique procedural requirements that make a hybrid action difficult to manage.").

(*See* Doc. 75).  The evidence includes better quality copies of photos previously filed in support of summary judgment and new security video footage of the altercation that occurred on September 7, 2018; the latter was not previously filed of record.  Defendant also filed as new evidence the Declaration of William C. Wietmarschen, the Assistant Office Manager and Grievance Coordinator for the Hamilton County Sheriff's Office, who serves as a custodian of records for the HCJC's inmate grievance process.  (Doc. 76 at ¶2).  In addition to the new evidence, Defendant filed a Supplemental Memorandum to address all issues as to which the Court directed additional briefing.  (Doc. 77).

Plaintiff filed a Supplemental Reply Memorandum on March 24, 2021.[3] (Doc. 79).  In contravention of this Court's order to file only a single reply, Plaintiff also filed a pre-emptive Memorandum on March 1, 2021, *before* Defendant filed his Supplemental Memorandum and exhibits.   In his March 1 Memorandum, Plaintiff discusses "new[] evidence" relating to administrative exhaustion. (Doc. 74). Plaintiff asserts that his mother has copies of exhibits pertaining to that issue that ostensibly were "apart [sic] of this memorandum." (*See* Doc. 74 at 1, PageID 360).  Although no exhibits were attached, the undersigned infers that the Memorandum refers to three exhibits separately filed on March 4, 2021.  (Doc. 78).

## II.    Summary Judgment Standard of Review

The same standard of review for summary judgment more fully set forth in the October 16 R&R continues to apply on reconsideration of the record.  Briefly, "a court must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the non-moving party." *Keweenaw Bay Indian Comm. v. Rising*, 477

---

[3] The Memorandum was marked received by the Sixth Circuit Clerk of Court on March 22, 2021, and therefore is considered timely filed.

F.3d 881, 886 (6th Cir. 2007) (internal quotation marks omitted).  After a moving party has carried its initial burden of showing that no genuine issues of material fact remain in dispute, the burden shifts to the non-moving party to present specific facts demonstrating a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). In order to survive summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505 (1986). The court determines whether the evidence requires submission to a jury, or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

### III.    Analysis

### A.  Whether the Post-R&R Affidavit Should Be Admitted

Judge Cole returned the matter to the undersigned for further consideration of Plaintiff's "affidavit" "in an abundance of caution, and in the interest of justice."  (Doc. 70 at 16, PageID 337).  Thus, the first order of business is to determine whether the affidavit should be admitted into evidence and fully considered.

### 1.  The Case Against Considering Post-R&R Evidence

Defendant now asks this Court to strike Plaintiff's affidavit and to reaffirm the October R&R recommending summary judgment to the Defendant based upon Plaintiff's failure to come forward with any timely evidentiary support for his claims.  Defendant's argument is broadly persuasive.  In general, the consideration of new evidence that is proffered *after* a Report and Recommendation has been filed should be extremely rare.

The case for allowing the consideration of any new evidence at all rests on the language of Rule 72(b)(3), Fed. R. Civ. P., which dictates how to resolve Objections

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

*Id.*

A number of courts have suggested that Rule 72 limits the consideration of new evidence that is untimely or that is not submitted with a proper objection. *U.S. v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000); *see also Muhammad v. Close*, 798 F.Supp.2d 869, 875 (E.D.Mich Jul. 8, 2011) (holding that "district courts have discretion to consider evidence first presented after a magistrate judge files a report, <u>provided the evidence is furnished by the time objections to the report and recommendation are due</u>.") (emphasis added).

Here, the Court determined that Plaintiff did not "properly" object because (1) he filed no <u>timely</u> objections to the summary judgment R&R; (2) the document that was construed as only a possible objection ("assuming that is what it is") was so general that it was not subject to de novo review; and (3) the construed possible objection raised no argument at all concerning qualified immunity, the issue on which judgment was granted. Under such circumstances, the undersigned would find that new evidence that was attached only to an improper and untimely construed Objection should not be considered under Rule 72(b)(3).  However, the Sixth Circuit has not offered definitive guidance on the potential constraints of the rule.  For purposes of this case, therefore, the undersigned accepts that district courts may have unlimited discretion to "receive further evidence" *at any time*, even in the absence of <u>any</u> timely filed or proper objections.  *See generally,*

*Moore v. United States*, 2016 WL 4708947, at *2-3 (E.D.Ky Sept. 8, 2016) ("Even though issues and arguments not raised before the magistrate judge are waived, district judges have discretion to decide whether to entertain new evidence.").

The proposition that new evidence may be considered at any time, however, does not eliminate the exercise of discretion, which requires consideration of "[t]he language of the Magistrate Act, its legislative history, Supreme Court precedent, and practical considerations." *Howell*, 231 F.3d at 622. Those considerations suggest a cautious approach. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988) (holding that discretion to admit new evidence "must be exercised sparingly").

> To require a district court to consider evidence not previously presented to the magistrate judge would effectively nullify the magistrate judge's consideration of the matter and would not help to relieve the workload of the district court. "Systemic efficiencies would be frustrated and the magistrate judge's role reduced to that of a mere dress rehearsal if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round."

*Howell*, 231 F.3d at 622 (quoting *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 322 (1st Cir. 2008)); *Blackwell v. McCord*, No. 3:13-CV-0739, 2016 WL 3444502, at *1 (M.D. Tenn. June 23, 2016) ("The presentation of new evidence to the district court that was not presented to the magistrate judge is disfavored.").

The Fifth Circuit has suggested that in exercising its discretion on whether to consider new evidence, a court should consider:

> (1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted.

*In Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 861-62 (5th Cir. 2003) (*citing Freeman v. County of Bexar*, 142 F.3d 848, 853 (5th Cir. 1998)); *see also Moore*, 2016 WL 4708947 at *2-3.

Nearly all factors disfavor the Court's consideration of Plaintiff's affidavit in this case. Plaintiff has offered no justification at all for failing to submit the affidavit in a timely manner. Every piece of information related in the affidavit was previously available; the affidavit closely aligns with Plaintiff's complaint. Plaintiff had ample opportunity to participate in discovery in order to provide more substantive evidence to prove his claim, but failed to do so. Plaintiff served no written discovery requests at all within the discovery period, even while he continued to file motions seeking time off of his sentence. (*See, e.g.*, Docs. 39, 44). After the initial discovery period had closed, Plaintiff filed a single tardy discovery request (violating local rules in the process), seeking "all reported documents records against Defendant Mark Evers history of him using 'excessive force' or 'incidents' against other inmates, which I could use during trial…." and "copies of the photographs taken" on September 7, 2018. (Doc. 47). The Court pointed out that Plaintiff's discovery request was both untimely and procedurally improper, but nevertheless "[i]n the interests of justice," directed Defendant to respond "within thirty (30) days." (Doc. 49).[4]

The unfair prejudice to Defendant caused by Plaintiff's exceedingly late-breaking affidavit is undeniable. Defendant could not anticipate that the factual record would be disputed at the time it filed its motion or its reply in support of summary judgment. "[I]t [is]

---

[4] The Court has no information concerning what, if any, discovery was produced. The Order did not "preclude Defendant from filing properly-supported substantive…objections to any portion of the discovery requests." (Doc. 49 at 2, n.1).

fundamentally unfair to permit a litigant to set its case in motion before the magistrate [judge], wait to see which way the wind was blowing, and - having received an unfavorable recommendation - shift gears before the district judge." *Paterson-Leitch Co.,* 840 F.2d at 991. That the Plaintiff in this case proceeds pro se, or that he is incarcerated, should not engender any particular leniency. *See*, *generally*, *McNeil v. United States*, 508 U.S. 106, 113 (1993) (pro se litigants must still comply with the procedural rules that govern civil cases).  After all, nearly a third of litigation in federal courts is initiated by pro se litigants, and the vast majority of them are prisoners. *Accord Jourdan v. Jabe,* 951 F.2d 108 (6th Cir.1991) (prisoner suing pro se was not entitled to special consideration in determining whether to dismiss complaint for failure to adhere to readily comprehended court deadlines.).  The Sixth Circuit has acknowledged that the practice of allowing additional evidence after a party has lost a disputed issue of fact would lead to never-ending litigation, as well as putting the opposing party at a distinct disadvantage.  *Ramsey v. United Mine Workers of America*, 481 F.2d 742, 753 (6th Cir. 1973).  Based upon the above principles and the record of this case, the undersigned recommends that Plaintiff's affidavit not be further considered, and that the prior R&R should be adopted and summary judgment granted on the qualified immunity grounds set forth therein.

## 2. Alternative Reasons to Consider New Evidence

And yet, the undersigned cannot help but note that the recommendation to ignore Plaintiff's affidavit feels a bit like closing the barn door after the horse has bolted.  At this stage, the Court already has considered the affidavit (somewhat) and has directed additional briefing by both parties and the supplementation of the record with additional evidence.   Defendant has filed multiple new evidentiary exhibits to address the

statements contained in the affidavit and the exhaustion issue and has submitted a 17-page Supplemental Memorandum.  Plaintiff also has submitted additional evidentiary exhibits and two supplemental Memoranda.  In light of all that has transpired, the undersigned alternatively recommends consideration of the additional evidentiary exhibits and memoranda filed by both parties.  Ultimately, however, consideration of the new evidence does not alter the recommendations contained in the October 16, 2020 R&R. In short, the undersigned still recommends that summary judgment be denied on administrative exhaustion and granted on qualified immunity grounds.

### B.  Administrative Exhaustion in Light of New Evidence

Defendant previously sought judgment on grounds that Plaintiff had failed to exhaust his administrative remedies. Pursuant to the Prison Litigation Reform Act (PLRA), prisoners are required to fully exhaust available institutional remedies prior to filing suit in federal court. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983 (2002). In his motion for summary judgment, Defendant previously asserted that Plaintiff had not even completed the first step of HCJC's grievance procedure, which Defendant represented (without presenting a copy of the policy) was identical to the 3-step grievance procedure set forth in Ohio Admin. Code §5120-9-31.

The prior R&R described the issue as "relatively close" because although Plaintiff claimed to have completed an initial grievance, he "does not argue that he timely complied with either step two or step three after the requisite time period expired without a response to his step one grievances," (Doc. 64 at 12, PageID 291).   However, the undersigned determined that Defendant had failed to carry his burden of proof under Rule 56, because Defendant did not point to *evidence* to support his argument that Plaintiff had filed only one unrelated grievance.  "[D]espite including a copy of the unrelated June 26 grievance, Defendant has failed to support his argument that no other grievances exist with a declaration or affidavit from any institutional custodian."  (Doc. 64 at 10, PageID 289).

Defendant's argument alone was insufficient because Plaintiff had argued (also without evidence) that he had filed numerous grievances over the incident.  (Doc. 64 at 11, PageID 290, citing Doc. 56 at 2-3 and Doc. 60 at 2).   In the absence of probative evidence on point, an issue of material fact remained.

> The parties' contrasting arguments present a factual issue concerning the third exception to the PLRA's exhaustion requirement: the possibility that jail administrators deliberately ignored or discarded Plaintiff's grievances. Unfortunately, neither Plaintiff nor Defendant point to any *evidence* by which the undersigned can resolve this issue on summary judgment.

(Doc. 64 at 11, PageID 290).   The record similarly was lacking evidence that could establish whether Plaintiff had exhausted the appeals portion of the grievance process.

Judge Cole acknowledged the same lack of evidence.  (*See* Doc. 70 at 26, PageID 347, citing the allegations in Plaintiff's complaint and Plaintiff's assertion in his "motion to reopen" that he received no response to the grievance). However, because the matter was being recommitted for consideration of Plaintiff's affidavit, Judge Cole directed the undersigned to

16

allow Evers to supplement the record on the administrative exhaustion issue (and to allow Johnston to respond to any new evidence Evers provides). It may be that Evers can address the evidentiary shortcoming that the R&R identified as to the second and third steps of the grievance procedure.

(Doc. 70 at 27, PageID 348).

In his Supplemental Memorandum, Defendant first corrects a significant error in the record by explaining that prior defense counsel incorrectly represented that HCJC's grievance procedure is identical to the 3-step procedure used at state institutions.  It is not.  Instead, the inmate grievance process for the HCJC is governed by the policy and procedure attached to the Declaration of William C. Wietmarschen.  (*See* Doc. 76-1, PageID 372-377).  Unlike the state policy, the HCJC grievance procedure is only two steps, consisting of an initial grievance and an appeal to a Captain of the facility.

The policy states that an inmate may verbally lodge a grievance or may file a "Standard Grievance" in writing "within ten (10) days after the event has occurred."  (Doc. 76-1 at 2, PageID 373, Procedure No: F.6).  If the inmate completes the standard form, he is required to "place the form in the mail box in their housing unit."  (*Id.*)  The "Support Service Staff" are to review each grievance and "will record and log all grievances and required Information in the Jail Management System (JMS) and at the direction of the Grievance Coordinator, refer unresolved grievances[5] to the proper department head."  (*Id.* at 2-3, PageID 373-74) .  The date that the grievance is referred to the department head also must be logged in the JMS system.  (*Id.* at 3, PageID 374).  Once received by a department head, the department head enters a response in the same system "within

---

[5] Prior to referral to the department head, the policy permits Support Service Staff to attempt to resolve the grievance informally.

ten (10) business days." (*Id.*)  If additional time is required, that too must be documented and the inmate must be notified in writing.  (*Id.* at 6, PageID 377).

The second step of the HCJC grievance process is an appeal. The policy sets forth that process as follows:

> When a grievance cannot be resolved to the inmate's satisfaction by action at the department-head level within ten (10) days, the inmate may file an appeal to the Administrative Captain or Support Service Captain assigned to the Justice Center Complex whose area is affected. The inmate must request the appeal form from the Classification Specialist and file the appeal within ten (10) business dates [sic] of receipt of the original response.

(Doc. 76-1 at 5, PageID 376).

In his original Memorandum, Defendant maintained that Plaintiff did not satisfy the first step because he did not file a grievance about Evers' conduct.  In his Supplemental Memorandum, Defendant builds on that argument, asserting a failure of exhaustion at both the initial step of the HCJC process and at the appeal level.  The prior recommended denial of summary judgment was based upon Defendant's failure to submit the affidavit of a records custodian to support his argument that Plaintiff had failed to file an initial grievance.  Defendant attempts to close that evidentiary gap with the Declaration of the Grievance Coordinator in charge of the HCJC grievance system, who also serves as a records custodian.  Mr. Wietmarschen's Declaration attests that the Hamilton County Sheriff's Office has only one unrelated grievance, and no record of any other grievances filed by Plaintiff in 2018. (Doc. 76-1, PageID 370).

Defendant argues that Plaintiff's affidavit – asserting that he wrote out a "grievance" on the date of the incident - is insufficient to create an issue of fact because Plaintiff never states that he actually submitted the grievance in the manner required by

the HCJC policy.[6]  The affidavit states only that Plaintiff "grab[bed] a hand full of pink Grievance forms and wrote the 'incident' on what had occurred in full detail front and back of the Grievance form."  (Doc. 67-1 at 5, PageID 315; *see also id*. at 7, PageID 317).  Despite the affidavit's failure to state precisely how Plaintiff submitted the relevant grievance form to HCJC,[7] submission of the grievance is strongly applied and alluded to later in the same affidavit.  Drawing all reasonable inferences in favor of Plaintiff, the undersigned again finds the existence of an issue of material fact, and recommends the denial of summary judgment on this "first step" issue.  *Accord Troche v. Crabtree*, 814 F.3d 795 (6th Cir. 2016) (explaining that inmate's sworn declaration that he submitted grievances was sufficient to create a genuine issue of material fact that precluded summary judgment on exhaustion issue).

Defendant next argues that Plaintiff failed to exhaust when he failed to timely appeal.  According to Defendant, Plaintiff should have been on notice of his need to appeal when he did not receive any response to his grievance by September 20, 2018, at which time Defendant asserts that Plaintiff's appeal time began to run.  The policy states that Plaintiff was required to request an "appeal form from the Classification Specialist" and file an appeal "within ten (10) business dates [sic] of receipt of the original response."  However, Plaintiff attests that, after receiving no response at all to his initial

---

[6] The HCJC policy states that an inmate may file only one grievance per incident and does not dictate that each type of claim or each jail official be identified with particularity.  Thus, the fact that Plaintiff's primary complaints about the "incident" appear to have been focused on his medical treatment or disciplinary ticket does not mean that he failed to properly grieve the excessive force claim. "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218, 127 S.Ct. 910, 923 (2007).

[7] Other references to the completion of grievances by Plaintiff do not concern the conduct at issue on September 7, 2018.  (*See, e.g*., Doc. 67-1 at 6; PageID 316, complaining about a separate incident with Evers on September 15, 2018; *Id*. at 7, PageID 317, complaint about incident with Deputy Cox).

grievance, he wrote a "Grievance form in the month of October 2018 to the Lieutenant about the incident that happen on September 7, 2018." (Doc. 67-1 at 7, PageID 317). He further attests that he used "Social Service forms" – allegedly after his grievance forms were ignored – and that he began "writing Grievance forms to the Captain" of HCJC in November 2018. (*Id.*)

Defendant points out that on its face the HCJC policy does not allow an appeal to a Lieutenant. As to the grievance allegedly submitted to the Captain in November 2018, Defendant argues that even if that form were construed as an appeal, it was untimely under HCJC policy.

Defendant's argument is unpersuasive. Unlike some institutional policies, the HCJC policy does not specify that a lack of a response after the ten-day response time should be treated as a denial, from which the appeal time begins to run. *See Troche v. Crabtree*, 814 F.3d at 801 ("[A]ll prison grievance procedures are not made alike, and what a prisoner is required to do by one grievance procedure to exhaust his administrative remedies is not necessarily required by another."). In fact, the ten-day period for filing an appeal appears to be triggered only upon "receipt of the original response." (Doc. 76-1 at 5, PageID 376). The policy dictates no clear course of action in the event (as Plaintiff attests) that no timely response is ever received. Because HCJC did not have an established policy for "appealing" a non-response, Plaintiff cannot be deemed to have failed to timely appeal.

Having concluded that Defendant is not entitled to summary judgment on the administrative exhaustion issue even if both Wietmarschen's and Plaintiff's affidavits are considered, the undersigned will only briefly discuss the additional arguments offered by

Plaintiff. In his March 22, 2021 Reply Memorandum, Plaintiff complains mostly about his medical care; the memorandum adds nothing new to the issue of exhaustion.[8] (*See generally*, Doc. 79 at 2, PageID 406, complaining about message from HCJC doctor that he saw no chin fracture). In his March 1, 2021 Memorandum, Plaintiff argues that his exhibits prove that he used the HCJC "Social Serv[ic]es slip" to seek help after allegedly writing grievances "numberless times" at HCJC without response.[9] (Doc. 74 at 3, PageID 362). But none of the exhibits show a formal HCJC "grievance" against Evers. Exhibits 1 and 2 are requests seeking x-ray results from HCJC and transport to UC hospital for an additional x-ray. (*Doc. 78* at 1, PageID 395; *id.* at 2, PageID 396). Exhibit 3 seeks relief against Defendant Evers for the alleged assault, but is neither timely nor directed to HCJC. Instead, it is comprised of Plaintiff's November 23, 2018 letter to the City of Cincinnati's Citizen Complaint Authority ("CCA"), complaining about the incident and expressing his desire to press charges against Evers. (Doc. 78 at 6-9; PageID 400-403). Exhibit 3 also contains the City's response, which advises that Plaintiff's request is being denied because it falls outside of the investigation criteria for the CCA. (Doc. 78 at 3, PageID 397).

### C. Defendant Remains Entitled to Qualified Immunity on the Underlying Excessive Force Claim

To supplement the record, Defendant filed enhanced copies of the photographs previously submitted on summary judgment and a new videotape of the incident.

---

[8] Plaintiff's March 1, 2021 memorandum incorrectly refers to the date of the incident as September 18, 2018.

[9] At times, Plaintiff uses the word "grievance" as a generic term to describe a multitude of complaints. (*See*, *e.g.*, Doc. 74 at 1, PageID 360, "I wrote a **grievance** to 'The City of Cincinnati,' City Hall, Civil Complaint Department." (emphasis added); Doc. 74 at 1-2, PageID 360-62, discussing "grievances" over medical care and having to "start writing grievance outside of" HCJC to seek "proper" medical attention).

Considering the contents of the affidavit and Defendant's new evidence, Defendant remains entitled to qualified immunity.  While a picture is worth a thousand words, the impact of the video record is exponentially greater.  Multiple statements in Plaintiff's affidavit are flatly contradicted by the video record.[10] "When self-serving testimony is blatantly and demonstrably false, it understandably may not create a genuine issue of material fact, thereby allowing a court to grant summary judgment." *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

In his affidavit, Plaintiff recounts that he was in a group of ten inmates being escorted by Defendant Evers.  According to Plaintiff, two inmates led the way, followed by Defendant Evers, with Plaintiff and Inmate Carter trailing behind Evers.  (Doc. 67-1 at 1, PageID 311).  The video record shows six inmates, including Plaintiff and Inmate Carter; all six are walking in front of Defendant Evers.

Plaintiff attests that during the transport, Inmate Carter instigated a fight with Plaintiff by punching Plaintiff on his left cheek, at which point Defendant radioed for assistance.  Plaintiff alleges that Inmate Carter attempted to punch Plaintiff a second time but that Plaintiff prevented him.  At that point, Plaintiff states that Carter grabbed Plaintiff's face and dug in with his nails.  Plaintiff states that about the same time, he felt Evers knee him in the rib, after which Defendant Evers punched Plaintiff twice in his right jaw.  Plaintiff's 7-page affidavit account of Evers' conduct is quoted extensively below, with minimal spelling and grammatical corrections and the addition of paragraph breaks only as necessary to increase readability:

> I tell inmate Carter to let me go, a few times before I balled up my free hand and hit inmate Carter on top of his head to release me, as he would not let go and Deputy Mark Evers was now trying to punch me the third time, but I

---

[10] Plaintiff made no formal request for the videotape prior to the close of discovery. (*See* Docs. 47 49).

avoid it by pulling inmate Carter off the wall onto the floor.  Inmate Carter was still holding onto my face with his nails and I ask him again to let go of me, when Deputy Mark Evers punch me on the left temple trying to knock me out, as I hop over inmate Carter to escape from Deputy Mark Evers['] blows.

As Deputy Mark Evers now walk around inmate Carter while he is still laying on the floor and his nails dig into my face, then Deputy Mark Evers had punch me two times in my right jaw again, while I [observe] Deputy G[r]eer, and Deputy Flin[c]hum on the side line watching Deputy Mark Evers assault me.  Soon Deputy Mark Evers knee me in my right jaw, so hard and that's when inmate Carter finally let go of my face and I raised up, then said why the fuck you hit me in my face all them times?  Deputy Mark Evers responded and said mutha fucker I said stop, which he never said nothing and use excessive force, as he grab inmate Carter by the arm and headed down the hallway, then Deputy Greer was trying to slam me.

(Doc. 67-1 at 2-3, PageID 312-313).

The video submitted by Defendant is 16:30 minutes in length.  The most relevant portion begins around 1:12 minutes, with the fight between Plaintiff and Carter occurring at 1:30 and concluding with the separation of the two inmates at approximately 2:05.  The video contradicts Plaintiff's statements in multiple respects, and confirms – as Defendant puts it – that Plaintiff "has severely undersold his participation" in the fight.  (Doc. 77 at 9, PageID 386).  In the video, the two inmates are seen engaged in a brief but fierce physical altercation.

Within seconds of the outbreak of the fight, Defendant Evers moves quickly in a clear attempt to physically separate the combatants and restore order.  Within ten seconds, a second deputy runs in from an adjacent hallway to assist, quickly followed by a third deputy who joins the chaotic fray in an attempt to assist the separation of the two brawling inmates.  The video shows all three deputies actively engaged, working together to separate the two in what is obviously a very fluid and dangerous situation.  In other words, Plaintiff's statement that the two were easily separated and that Defendant walked

23

around Carter while Carter was laying on the floor in order to continue assaulting Plaintiff is demonstrably false, as is Plaintiff's claim that Deputies Greer and Flinchum stood calmly by watching Defendant assault Plaintiff. Finally, Plaintiff's statement that Defendant grabbed Carter by the arm and walked him down the hallway is incorrect; the video shows Deputy Flinchum performing that task while Evers and Greer worked to restrain and cuff Plaintiff.

Plaintiff is helped to his feet by Evers and Greer at approximately 2:40 on the video. Within a few seconds, Plaintiff is seen turning toward and speaking closely to Defendant; Defendant reacts by briefly shoving Plaintiff away from him – an action that he described in a contemporaneous incident report as well as in his affidavit and from which it is undisputed that Plaintiff suffered no injury.[11] To be clear, this Court does not condone any unnecessary force. However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the constitution. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989); *accord Choate v. Arms*, 274 F.Supp.3d 782, 785 (M.D. Tenn. 2017) (applying same principle to pretrial detainee). In context and under the circumstances shown on the videotape, and considering that Plaintiff was not injured from the shove, the undersigned finds no constitutional violation from that singular act.

After the shove, Defendant steps back from Plaintiff and remains in view of the camera, clearly separated from Plaintiff with no further physical contact occurring

---

[11] Plaintiff argues in his March 22 Memorandum that Defendant did not previously admit this action. However, the contemporaneous incident report authored by Defendant states as follows: "After being handcuffed, Johns[t]on started threatening me ….and while saying that he took a step towards me so I pushed him to gain distance." (Doc. 50-4). Defendant's affidavit similarly attests that Plaintiff "began making verbal threats to me and took a step towards me, requiring me to push him back to gain some space." (Doc. 51 at ¶8).

between the two.  After being subdued, Plaintiff is seated off-camera in a chair near Deputy Greer.[12]  After just over a minute, during which Defendant appears to be engaged in conversation with Plaintiff and/or Greer, Defendant Evers calmly walks away and returns to the opposite end of the hallway.  He does not "storm down the hallway" as Plaintiff attests.  Defendant never resumes any physical proximity to Plaintiff.  No choking incident occurs.[13]

In contrast to what is shown on the video, Plaintiff's affidavit relates the following (false) version of events after he was subdued:

> I did not fight back and I explain to Deputy Greer that I wasn't about to let him slam me on the ground after being punch in my head five times, which I put my hands behind my back and Deputy Greer handcuff me, then walk me over to the chairs.  As I took a seat and here comes Deputy Mark Evers getting all in my face, while I was detained and sitting in the chair.  Deputy Mark Evers was very aggressive, as he started rubbing his knuckle and cursing at me.  And yes!  I was cursing right back at him, but not once did I get out of that chair and try to attack Deputy Mark Evers because my [arms] were cuffed.  Deputy Mark Evers let my true words about how wrong he was for putting his knees and punching me all them times, upset him and that made him choke me out the chairs.  Yes, Deputy Mark Evers put both of his hands around my neck, then pull me up out the chair, as he started shaking me and seen me look right into the camera, because he forgo the[y're] cameras in the hallway and he let me go, then storm down the hallway.
>
> Yes, I was upset for being so violated by Deputy Mark Evers, but I never hit him or tried to hit him before the handcuff was place on me, nor swinging wildly, that Deputy Mark Evers [allegedly] claim.  I heard Deputy Mark Evers tell inmate Carter to tell his "super[[iors" that I swing first and started the fight, when they arrive.  As Sgt. Moore leave from talking to Deputy Mark Evers and ask me why I can't keep my hands to myself.  And I told her that the inmate and Deputy jump me, as she laught [sic] it off.

---

[12] The incident report previously submitted in support of summary judgment states that Plaintiff was placed in the chair in the hallway by Deputy Greer.  (Doc. 50-4 at ¶9).  While seated, Plaintiff and Greer are obscured off camera, but because Defendant remains on camera, the video confirms that Defendant did not physically approach or assault Plaintiff while he was seated in the chair.

[13] Plaintiff did not raise the alleged "choking" incident at the review board hearing on his fighting ticket. (Doc. 52-2, PageID 214).

(Doc. 67-1 at 3-5, PageID 313-315).   Again, the video evidence clearly shows that Defendant Evers did not "jump" Plaintiff or assault him, but used physical force to restore order.  After order was restored, he did not choke Plaintiff.

The remainder of Plaintiff's affidavit sets forth an account of his alleged injuries from the incident as well as Plaintiff's testimony about various "grievances." According to Plaintiff, the unidentified group of deputies who escorted him to receive medical care "only let the nurse put a bandaid on my nose from one [of] the open cuts that inmate Carter did from his nails, then rush me out of medical because the nurses was treating Deputy Mark Evers['] knuckle, so I did not get the care that I needed."  Plaintiff complains that after he was returned to his cell,

> I look at the mirror and seen how swelling my left temple, right jaw and nail marks in my face bleeding.  Then I had removed the bandaid from my nose to see the deep open cut from Inmate Carter nail.  30 minutes or more I was call out the cell to give my statement and have photo's taken of face by Sgt. Melissa Kilday, then on my way back to my cell I grab a hand full of pink Grievance forms and wrote the "incident" on what had occurred in full detail front and back of the Grievance form.   September 10, 2018 is when I'd attend my hearing for the ticket and was found guilty, because of Deputy Mark Evers allegedly said what happen.  Which I filed my "appeal" for the ticket on September 10, 2018.

(Doc. 67-1 at 5-6, PageID 315-16).

In contrast to Plaintiff's self-serving statements in his affidavit, neither the video nor photographic evidence of record reflect any visible swelling or bleeding.   The contemporaneous photographic record shows no more than a band aid on Plaintiff's nose covering the minor injury that Plaintiff admits he received from Inmate Carter, not Defendant.[14]  (*See also* Doc. 50-3, (contemporaneous report noting that Plaintiff denied

---

[14] Plaintiff argues that he cannot provide any medical evidence demonstrating anything more than the de minimis injury reflected in Defendant's photographic evidence, "because I never had the chance to seek medical help."  (Doc. 74 at 3).  Of course, that explanation does not address the discrepancy between

any injury and had no visible injuries other than the abrasion on his nose); Doc. 50-1 at 3-4; Doc. 50-2).

In order to prove excessive force that violates the 14th Amendment, "a pretrial detainee must show… that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473, 576 U.S. 389, 396-97 (2015).

> The inquiry is highly fact-dependent, and must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* It should also account for "the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' " *id.,* and defer when appropriate to " 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'"

*Coley v. Lucas County, Ohio*, 799 F.3d 530, 538 (6th Cir. 2015) (quoting *Kingsley*, 135 S. Ct. at 2473).

In light of the video record now available to the Court, the undersigned stands by the October 16, 2020 recommendation that summary judgment be granted to Defendant based upon qualified immunity, because the Defendant's use of force to stop the ongoing fight was objectively reasonable. *Accord Ayala-Rosales v. Teal*, 659 Fed. Appx. 316, 321 (6th Cir. 2016) (holding post-*Kingsley* that force used to control a drunken pretrial detainee was entitled to some deference); *see also Smith v. Wilson County Sheriff's Office*, 2018 WL 3473966, at *5 (M.D. Tenn., 2018) (granting motion to dismiss where pretrial detainee alleged that force used to break up fight was excessive).

---

Plaintiff's allegation that his chin bone was "poking out" after the incident, (Doc. 11), nor does it address Plaintiff's failure to produce x-rays or any follow-up medical records from care provided at other institutions, including the prison in which he is currently incarcerated.

In Plaintiff's March 22 Reply Memorandum, he cites to his personal experience of witnessing other fights broken up during his incarceration in two jails and two prisons. Plaintiff suggests that Defendant should have first commanded the inmates to stop (which Defendant avers he did) and only if unsuccessful, employ chemical spray.  Plaintiff makes clear that he believes that deputy jailers are not constitutionally permitted to use force (beyond chemical spray) to break up an inmate fight unless the officers or deputies are themselves attacked. (Doc. 79 at 4, PageID 408; *see also* Doc. 74 at 2, PageID 361, arguing that the 14th Amendment was violated because the fight was only a "'small altercation' that could've been handle[d] more professional[ly] by all three deput[ies] who were on scene.").

Plaintiff's perception of what lesser force might have been employed by the Defendant in the heat of the moment, or Plaintiff's concerns about whether Defendant's actions demonstrated sufficient professionalism, does not reflect the applicable constitutional standard. *See Ayala-Rosales v. Teal*, 659 Fed. Appx. at 321 (rejecting claim that deputies violated local policy requiring lesser force, because the 14th Amendment "does not require officers to use progressive force nor does it prescribe the ideal type or amount of force allowed" but "requires only objectively reasonable force based on all of the facts and circumstances surrounding its use."). Here, Defendant was the lone escort of a group of inmates in a hallway when a violent and potentially dangerous fight erupted. Defendant's split-second decision to employ his knee and fists in an attempt to stun and quickly separate and subdue the combatants was not objectively unreasonable.  In the absence of any clearly established constitutional violation, Defendant is entitled to qualified immunity.

## IV.    Conclusion and Recommendations

For the reasons discussed, **IT IS RECOMMENDED**:

1.  Plaintiff's "motion/appeal" (Doc. 72) should be DENIED;

2.  Plaintiff's additional motion/habeas petition (Doc. 73) should be DENIED without prejudice to re-file as a new case if appropriate;

3.  Neither Plaintiff's post-R&R affidavit nor any other new evidence should be considered, with the recommendation of the October 16, 2020 R&R to remain unchanged based upon the undisputed record that the force used was objectively reasonable;

4.  *In the alternative to the recommendation contained in Paragraph 3*, and based upon the unique record presented in this case, both Plaintiff's affidavit and all new evidence proffered by Defendant should be considered.  Considering all additional evidence, Defendant's motion for summary judgment still should be granted on qualified immunity grounds because the use of force was not objectively unreasonable under clearly established 14th Amendment standards.


_s/Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

DAMASO L. JOHNSTON,                                    Case No. 1:18-cv-864

      Plaintiff,                                              Cole, J.
                                                       Bowman, M.J.

          v.

HAMILTON COUNTY JUSTICE CENTER, et al.,

      Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN  (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).